IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____

UNITED STATES,           )
          Plaintiff,    )
               )    Case No. DKC-12-0086
     v.            )
               )
SAMUEL BRAXTON,     )
          Defendant.   )
_____)

## SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE

Samuel Braxton, through undersigned counsel, respectfully submits this supplemental memorandum in support of his emergency motion for compassionate release, which he filed *pro se* under 18 U.S.C. § 3582(c)(1)(A)(i) based on the "extraordinary and compelling reason" presented by his vulnerability to COVID-19. Mr. Braxton is 52 years old, extremely obese (with a body mass index of 53.2), and he suffers from asthma, hypertension, and diabetes, which place him at high risk of suffering severe complications from COVID-19. Further, Mr. Braxton is housed at FCI Ft. Dix, a facility where at least nine inmates are currently suffering from active COVID-19 infections and at least 41 individuals (inmates and staff) have purportedly recovered from the disease.

Consistent with this Court's practice in similar cases involving inmates who are particularly vulnerable to COVID-19, it should issue an order reducing Mr. Braxton's 291-month sentence to time-served. *See, e.g.*, *United States v. White*, No. CCB-09-0369, ECF No. 142 (D. Md. July 10, 2020); *United States v. McRae*, No. PJM-

10-0127, ECF No. 134 (D. Md. July 7, 2020); *United States v. Martin*, No. DKC-04-235, ECF No. 2006 (D. Md. June 24, 2020); *United States v. Brown*, No. GLR-18-0190, ECF No. 54 (D. Md. June 11, 2020); *United States v. Williams*, No. PWG-19-0134, 2020 WL 3073320 (D. Md. June 10, 2020); *United States v. Gardner*, No. JKB-09-0619, ECF No. 72 (D. Md. May 27, 2020); *United States v. Wise*, No. ELH-18-072, 2020 WL 2614816 (D. Md. May 22, 2020); *United States v. Gutman*, No. RDB-19-069, 2020 WL 2467435 (D. Md. May 13, 2020); *United States v. Mel*, No. TDC-18-0571, 2020 WL 2041674 (D. Md. Apr. 28, 2020); *United States v. Winston*, No. RDB-13-0639, ECF No. 294 (D. Md. Apr. 28, 2020).

A time-served sentence is sufficient, but not greater than necessary, punishment under 18 U.S.C. § 3553(a) because Mr. Braxton does not pose a danger to the community. For nearly a decade, he has devoted himself to rehabilitative efforts, maintaining a nearly flawless disciplinary record, and serving as a suicide watch companion for fellow inmates. As a result of his exemplary behavior, he is currently housed in a low-security facility. What is more, as explained fully below, the 291-month sentence Mr. Braxton is serving was far more punitive than necessary to address his nonviolent conduct here. The lengthy term resulted from an overstated criminal record, and his sentence eclipsed the terms imposed on more culpable co-defendants—including the conspiracy's leader, who received a 180-month term despite having a violent history and possessing multiple firearms in this case. Alternatively, Mr. Braxton urges this Court to issue an order reducing his sentence to time served and modifying his judgment to add a period of home confinement as a condition of supervised release.

## STATEMENT OF FACTS

A.  <u>The offense</u>

Samuel Braxton pleaded guilty, pursuant to a written plea agreement, on September 24, 2012, to one count of conspiracy to distribute and possess with intent to distribute one kilogram of phencyclidine, 28 grams of cocaine base, and a detectable amount of heroin in violation of 21 U.S.C. § 846. According to the statement of facts accompanying the plea agreement, Mr. Braxton admitted to conspiring to sell drugs in Prince George's County, Maryland, and Washington, DC, between June 2010 and February 2012. Presentence Report ("PSR") at ¶¶ 10-14. In exchange for his guilty plea, the government agreed not to file a notice of Mr. Braxton's two prior drug convictions pursuant to 21 U.S.C. § 851, which would have mandated a life sentence. ECF No. 211 (Braxton Plea Agr.) at ¶ 10; PSR at ¶ 97.

B.  <u>The sentencing</u>

At sentencing, the district court calculated Mr. Braxton's advisory guidelines range. It used a base offense level 34 after finding that the conspiracy involved three kilograms of PCP, 28 grams of cocaine base, and 100 grams of heroin. U.S.S.G. § 2D1.1(c)(3) (2012) (converting drugs to nearly 3,200 kilograms of marijuana); *see* PSR at ¶ 6(a). The Court added a two-level role enhancement and a two-level use-of-minor enhancement, which produced an adjusted offense level of 38.[1] *See* U.S.S.G. § 3B1.1(c); U.S.S.G. § 3B1.4; ECF No. 461 (Sent. Trans.) at 25-27. After subtracting

---

[1] According to the statement of facts, in late December 2012, Mr. Braxton instructed his minor son to remove a bag containing PCP from his locker at a bowling alley. ECF No. 211-1 (Statement of Facts), at 2.

three levels for acceptance of responsibility, Mr. Braxton's final offense level was 35. PSR at ¶¶ 18-24; ECF No. 461 (Sent'g Tr.) at 37; *see* U.S.S.G. § 3E1.1.

Mr. Braxton had seven criminal history points, which placed him in a criminal history category IV. However, because he had two convictions for "felony drug offenses," the court designated Mr. Braxton a career offender under U.S.S.G. § 4B1.1 and increased his criminal history category to VI.[2] With a final offense level of 35 and a criminal history category of VI, Mr. Braxton faced an advisory guidelines range of 292-365 months.

At sentencing in April 2013, the Court spoke at length about Mr. Braxton's criminal record. The Court first described each of his three prior drug convictions, then referenced the "very long list of [charged] offenses" in the presentence report that did not result in conviction. ECF No. 461 at 52-53. According to the Court, the allegations produced "not a pretty picture . . . in terms of the history and characteristics of this defendant." *Id.* Then, appearing to lump the unproven and proven conduct into one generalized pattern of lawless conduct, the Court cited Mr. Braxton's record as a reason he "need[ed] to have a significant sentence." *Id.* at 57. The Court imposed a 324-month sentence, a term toward the middle of the already-enhanced guideline range, to be followed by five years of supervised release. *Id.* at 57-59. In the statement of reasons, the Court explained that "[a] sentence in the middle

---

[2] In 1990, Mr. Braxton was convicted of distributing at least five grams of cocaine base; and in 1997, he was convicted of distributing cocaine. PSR at ¶¶ 28, 31.

of the guideline range is appropriate in light of the defendant's extensive criminal history." ECF No. 305 (Statement of Reasons) at 2.

However, a closer look at the charged offenses—that, to be clear, did not result in conviction—demonstrates that the allegations were far less serious than the Court suggested at the hearing. Of the 15 offenses listed, nine stemmed from Mr. Braxton's failure to appear for a court proceeding. Of the remaining six offenses, four were driving infractions (either driving without a license or on a suspended license), one was a low-level drug offense, and one was an alleged assault. In every single case, prosecutors chose not to prosecute, or else affirmatively dismissed, the charges against Mr. Braxton. PSR at ¶¶ 41-55.

The Court did not acknowledge that each of Mr. Braxton's convictions was for a low-level drug or driving offense, that each was nonviolent, and that each stemmed from his untreated addiction. Nor did the Court acknowledge that, unlike Mr. Braxton's co-defendants (several of whom were found in possession of firearms or ammunition), the government did not allege that Mr. Braxton used or possessed a firearm at any time in this case.

Notable, too, is that despite the absence of allegations involving firearms or violence, the Court treated Mr. Braxton far more punitively than any of his co-defendants—even the conspiracy's leader. Mack Holland, the lead defendant, pleaded guilty to the conspiracy in addition to two firearm offenses—unlawful possession of a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Like Mr. Braxton, Mr. Holland was served with a § 851 enhancement notice

identifying two prior "felony drug offenses," which the government withdrew in exchange for the guilty plea. Mr. Holland agreed he was more culpable than, and had a far worse record than, Mr. Braxton. He admitted serving as the conspirators' "supplier"; when his residence was searched, officers seized four firearms and nearly $60,000 in cash; and he had a prior conviction for second-degree murder. Nonetheless, the Court sentenced Mr. Holland to 180 months, which consisted of a 120-month term for the conspiracy and a consecutive 60-month term for the firearm offense under § 924(c). *See* ECF No. 285 (Holland Plea Agreement); ECF No. 461 at 39. In other words, on the conspiracy count alone, Mr. Braxton received a 324-month sentence (later reduced to 291 months), while Mr. Holland received only a 120-month sentence.

| Defendants | Counts of Conviction to Which Def. Pleaded Guilty | Sentence Imposed |
|---|---|---|
| Mack Holland | Ct. 1 (conspiracy / § 846)<br>Ct. 2 (firearm / § 922(g))<br>Ct. 3 (firearm / § 924(c)) | 180 months |
| **Samuel Braxton** | Ct. 1 (conspiracy / § 846) | 324 months / reduced to **291 months** |
| Wayne Glymph | Ct. 1 (conspiracy / § 846)<br>Ct. 2 (firearm / § 922(g)) | 120 months |
| Donald Hunter | Ct. 1 (conspiracy / § 846)<br>Ct. 2 (firearm / § 922(g)) | 188 months |
| Rashard Wilson | Ct. 1 (conspiracy / § 846) | 235 months |
| Shareef Muhammad | Ct. 1 (conspiracy / § 846) | 144 months |
| Cortez Winston | Ct. 1 (conspiracy / § 846) | n/a |
| Kevin Brown | Ct. 1 (conspiracy / § 846) | 72 months / reduced to 60 months |
| Marcus Jones | Ct. 1 (conspiracy / § 846) | 71 months / reduced to 60 months |
| Beverly Barnes | Ct. 1 (conspiracy / § 846) | 24 months |
| Maurice Allen | Ct. 1 (conspiracy / § 846) | 12 months + day |

C. <u>The retroactive guideline amendment</u>

In early 2017, Mr. Braxton moved this Court for a reduced sentence under 18 U.S.C. § 3582(c)(2) following the retroactive application of Amendment 782 to the U.S. Sentencing Guidelines (which lowered the base offense level for most drug offenses by two levels). *See* ECF No. 484 (Pro Se Motion); ECF No. 486 (Supp. Motion). In his motion, Mr. Braxton sought a reduced sentence of 262 months, the low end of his amended guidelines range, which was 262-327 months.[3] In support, Mr. Braxton pointed to his record of rehabilitation, his placement in a low-security correctional facility, his low risk of recidivism, the absence of firearms or violence in his record, and the fact that his criminal record consisted of drug and driving offenses that stemmed from his underlying drug addiction.

The government filed a response in which it agreed that Mr. Braxton was eligible for a reduced sentence under § 3582. However, the government argued that the Court should not reduce his sentence to less than 291 months. A 291-month term, the government asserted, was "comparable to [Mr. Braxton's] original sentence" because it was "89% of the high end of his amended guideline range of 262 to 327 months." *See* ECF No. 488 (Govt. Resp.) at 2. In other words, the government asked the Court to mechanically impose the same sentence relative to the guidelines range

---

[3] Following Amendment 782, the base offense level for Mr. Braxton's offense was reduced from 34 to 32. U.S.S.G. § 2D1.1(c). With a two-level role enhancement and a two-level use of a minor enhancement, his adjusted offense level was 36, which the Court increased to 37 after applying the career offender guideline. Subtracting three levels for acceptance of responsibility, Mr. Braxton's final offense level was 34. With a criminal history category VI, his guidelines range was 262-437 months. *See* ECF No. 492.

that it did at the original sentencing in 2013—despite the fact that *Pepper v. United States*, 562 U.S. 476 (2011), required the Court to engage in a fresh analysis of the relevant § 3553(a) sentencing factors and despite the fact that the government offered no reason that a 291-month term was necessary to satisfy the goals of sentencing. *See* ECF No. 488 at 1-4.

On May 16, 2017, before Mr. Braxton filed a reply, the Court issued an order granting relief, in part. The Court reduced Mr. Braxton's sentence from 324 months to 291 months. The Court explained that it chose that term because it found persuasive the government's argument that "comparable reductions are favored" under § 3582, citing as support *United States v. Fennell*, 592 F.3d 506 (4th Cir. 2010). *See* ECF No. 492. But the Fourth Circuit opinion in *Fennell* held no such thing. That is, *Fennell* did not direct courts deciding § 3582 motions to impose terms at the same relative point within the amended range as the initial sentence was within the original range. Instead, the *Fennell* opinion addressed a particular clause in the applicable policy statement, U.S.S.G. § 1B1.10, that allows courts to impose *below-guideline* terms for substantial assistance. *See* U.S.S.G. § 1B1.10 (b)(2)(B) (allowing "a reduction comparably less than the amended guideline range" for substantial assistance departures).[4] In general, the policy statement prevents courts from

---

[4] In *Fennell*, the defendant originally faced an advisory guideline range of 121-151 months. The court sentenced him to 97 months after granting a downward departure for substantial assistance under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e). Following a retroactive guideline amendment that reduced his guideline range to 100-125 months, the defendant sought a reduced sentence of 80 months, which was roughly 20% below the bottom of the amended range. The district court granted relief, in part, reducing his sentence to 96 months, which was 20% below 120 months (the mandatory minimum term), rather than 100 months. On appeal, the Fourth Circuit

imposing reduced sentences under § 3582 that are below the amended guideline range. The sole exception to that rule is where a defendant provides substantial assistance under U.S.S.G. § 5K1.1; in those cases, courts may grant a downward departure "comparably less than the amended guideline range." U.S.S.G. § 1B1.10 (b)(2)(B).

Because the Fourth Circuit in *Fennell* interpreted the text of a policy statement that applies only to substantial assistance departures (which are irrelevant here), its holding does not even purport to describe how a court should select a term *within* an amended guideline range under § 3582. Thus, in Mr. Braxton's case, this Court's mechanical imposition of term toward the middle of the range was in direct conflict with the statute's directive that courts must select a reduced term after analyzing *all* relevant sentencing factors under 18 U.S.C. § 3553(a). Had the Court analyzed those factors, it likely would have agreed that 262 months, the lowest sentence allowed under the statute, was sufficient but not greater than necessary under § 3553(a).

D. <u>Mr. Braxton's rehabilitative record</u>

Mr. Braxton has been in federal custody since February 24, 2012. *See* Exhibit A (BOP Sent. Comp. Data) at 2. As of October 24, 2020, he has served nearly nine years (104 months) of his sentence. During this time, he has taken classes, he has worked, and he has served as a volunteer companion in the BOP's suicide watch program. He also has maintained a clear disciplinary record, incurring only a few

---

reversed. It held that the term "comparable," as it was used in U.S.S.G. § 1B1.10(b)(2)(B) to address cases involving substantial assistance departures, gives a court the discretion to use "any . . . reasonable method" to determine its extent. *Id.* at 509.

minor infractions, none of which resulted in the loss of good-time credit. As a result of Mr. Braxton's exemplary institutional record, the BOP has designated him to a low-security facility, FCI Fort Dix, even though more than a decade remains on his sentence.

    E.   <u>Mr. Braxton's pursuit of administrative remedies</u>

On April 13, 2020, Mr. Braxton filed a request for a reduced sentence with Warden David E. Ortiz at FCI Fort Dix. *See* Exhibit B (Inmate Request to Staff). On April 17, 2020, Warden Ortiz denied relief, stating that Mr. Braxton did not meet the compassionate release criteria contained in BOP Program Statement 5050.50. *See* Exhibit C (Inmate Request to Staff Response). More than thirty days have elapsed since Mr. Braxton's request was received by the warden; thus, he has satisfactorily pursued his administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A)(i).

## ARGUMENT

Samuel Braxton's underlying medical conditions—specifically, his extreme obesity, asthma, hypertension, and diabetes—make him particularly vulnerable to falling severely, even gravely, ill from COVID-19. As the government has conceded under similar circumstances, and as this Court has repeatedly held, such vulnerability constitutes an "extraordinary and compelling reason" for compassionate release. *See United States v. Cole*, Case No. ELH-18-0167, ECF No. 95 ("[T]he Government will concede that Defendant's body mass index (BMI) above 30 constitutes an extraordinary and compelling reason warranting a reduction [in] sentence."). Releasing Mr. Braxton from the low-security facility where he resides would not pose a danger to the community, especially in light of his age, compromised

health, and rehabilitative record, all of which render negligible any risk of recidivism. Finally, an analysis of the § 3553(a) sentencing factors—including the unduly harsh sentence Mr. Braxton originally received based on his overstated criminal record, the absence of any allegations of firearms or violence, the substantially shorter sentences imposed on more culpable co-defendants, and Mr. Braxton's exemplary rehabilitative record—clearly warrants relief here.

## A. Samuel Braxton's Vulnerability to Falling Gravely Ill From COVID-19 Due to His Extreme Obesity, Asthma, Hypertension, and Diabetes Presents an "Extraordinary and Compelling" Reason for Compassionate Release

Mr. Braxton has several of the high-risk factors associated with patients who suffer severe complications from COVID-19—namely, extreme obesity (as reflected by a body mass index of 53.2), asthma, hypertension, and diabetes. *See* Exhibit D (BOP Medical Records 2019); Exhibit E (BOP Medical Records 2020); Centers for Disease Control and Prevention, People of Any Age With Underlying Medical Conditions, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/ people-with-medical-conditions.html*. In fact, a study published in the Journal of the American Medical Association found that among 5700 patients in New York City who were hospitalized with COVID-19, the most common underlying medical conditions were *hypertension*, *obesity*, and *diabetes*—all of which Mr. Braxton suffers from. Safiya Richardson et al., Presenting Characteristics, Comorbidities, and Outcomes Among 5700 Patients Hospitalized with COVID-19 in the New York City Area*, JAMA, *https://jamanetwork.com/journals/jama/ fullarticle/2765184.*

11

In the context of COVID-19, which disproportionately harms patients who are overweight, courts around the country (including this one) have consistently held that one's obesity—reflected by a BMI of 30 and above—constitutes an "extraordinary and compelling reason" for compassionate release. In these cases, even where an inmate's BMI is significantly lower than Mr. Braxton's (53.2), and regardless of whether the person has comorbidities such as asthma, hypertension, or diabetes (all of which Mr. Braxton has), courts have granted relief. *See United States v. Jeffries*, No. RDB-14-0580, ECF No. 528 (D. Md. June 18, 2020) (reducing defendant's sentence to time served based, in part, on government's concession that obesity, diabetes, hyperlipidemia, and potentially cancerous growth constituted extraordinary and compelling reasons for relief); *United States v. Lee*, No. DKC-12-0493, ECF No. 55 (D. Md. July 20, 2020) (reducing 43-year-old defendant's sentence to time served based on obesity, hypertension, and type II diabetes, which "place him at increased risk of severe illness should he become infected"); *United States v. Brown*, No. ELH-01-0377, ECF No. 173 at 16 (D. Md. Sept. 25, 2020) (reducing 52-year-old defendant's sentence because his "obesity [BMI of 39], coupled with the rate of infection at Victorville FCI" constituted extraordinary and compelling reasons for relief); *United States v. Stockton*, No. ELH-99-0352, ECF No. 657 at 15 (reducing 49-year-old defendant's sentence based on obesity (BMI of 34), asthma, arthritis, high cholesterol, allergies, and esophageal influx); *United States v. Denny*, No. 04-cr-666, ECF No. 208 (D.N.M. Aug. 6, 2020) (granting compassionate release to 50-year-old defendant suffering conditions including obesity with BMI of 32.6); *United States v. Siegert*, No. 13-cr-80009, ECF No. 53 (S.D. Fla. Aug. 14, 2020) (granting compassionate release based

on defendant's obesity and other underlying medical conditions); *United States v. Mitchell*, No. 2:17-cr-20263, ECF No. 94 (E.D. Mich. Aug. 18, 2020) (granting release, over government's opposition, to 24-year-old defendant suffering from obesity with BMI between 31 and 32); *United States v. Kovalev,* No. 2:13-cr-103, ECF No. 382 (E.D.C.A. Sept. 4, 2020) (granting compassionate release to defendant suffering from borderline obesity with BMI of 30.1 and type II diabetes); *United States v. Black*, 2020 WL 4583056, at *3 (S.D. Ind. Aug. 10, 2020) (finding that 45-year-old defendant with obesity and asthma constituted extraordinary and compelling reason for release); *United States v. Walker*, No. 5:13-cr-030, ECF No. 552 (W.D.V.A. Sept. 14, 2020) ("The government recognizes Walker's obesity places him at higher risk for serious illness if he contracts COVID-19 pursuant to the Centers for Disease Control (CDC) guidance and thus presents an exceptional and compelling circumstance."); *United States v. Siegert*, No. 13-cr-80009, ECF No. 51 (S.D. Fla. Aug. 11, 2020) (conceding that defendant established "'extraordinary and compelling reasons' because, according to CDC Covid-19 Guidelines, his BMI exceeding 30 places him at an increased risk of severe illness"); *United States v. White,* No. 1:06-cr-763, ECF No. 491 at 15-16 (N.D. Ill. Aug. 24, 2020) (though defendant did not raise issue, government conceded that defendant's obesity would establish extraordinary and compelling reason for compassionate release).

Compounding Mr. Braxton's vulnerability to falling severely ill from COVID-19 is his age, 52 years, which presents another potential risk factor for the disease. The chance a patient will suffer fatal consequences from COVID-19 rises significantly among men *over age 50*. Exhibit F (Chris Beyrer Decl.) at ¶ 6 ("The case fatality rate

is higher in men, and varies significantly with advancing age, rising after age 50, and above 5% (1 in 20 cases) for those with pre-existing medical conditions including cardio-vascular disease, respiratory disease, diabetes, and immune compromise.").

Making matters worse, at FCI Fort Dix, where Mr. Braxton resides, nine inmates are currently fighting active COVID-19 infections, while 41 individuals (staff and inmates) reportedly have recovered after testing positive. Bureau of Prisons, COVID-19 Cases, *https://www/bop.gov/coronavirus/*. Despite the BOP's efforts to reduce the spread of the virus throughout federal correctional facilities, the rate of infection still remains far higher within those facilities than within the community at large. *See* Coronavirus in the U.S.: Latest Map and Case Count, New York Times, July 22, 2020, *https:www.nytimes.com/interactive/2020/us/ coronavirus-us-cases.html# clusters*.

Amid this unfolding crisis, the universally-recommended antidote is simple: reduce the prison population by release those whose continued incarceration is not necessary in order to protect the public by allowing correctional institutions to better protect those who need to stay incarcerated. Mr. Braxton is exactly the type of individual deserving of relief under § 3582(c)(1)(A)(i). He is at risk of falling severely—even gravely—ill and, as addressed in the following section, a balancing of the § 3553(a) sentencing factors warrants granting him compassionate release.

## B. The Relevant § 3553(a) Sentencing Factors Weigh Strongly in Favor of Reducing Samuel Braxton's Sentence to Time Served

Under the compassionate release statute, when a defendant establishes the existence of extraordinary and compelling circumstances justifying relief, courts must

consider the relevant sentencing factors of 18 U.S.C. § 3553(a) to determine whether a sentencing reduction or modification is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, Mr. Braxton's age, compromised physical health, and the unique danger he faces of developing severe complications from COVID-19, when combined with the other § 3553(a) sentencing factors (including evidence that he would not pose any danger to the community), clearly warrant relief.

1. <u>The history and characteristics of Mr. Braxton and the nature and circumstances of his offense warrant a time-served sentence</u>

Mr. Braxton does not dispute that his conduct of selling drugs in Prince George's County, Maryland, was a serious offense. But it is important to note that his behavior was never violent and did not involve any weapons. Mr. Braxton (unlike some of his co-defendants) was not found in possession of a firearm. In fact, the government did not allege that he used or possessed a weapon or that he engaged in any actual, attempted, or threatened acts of violence. PSR at ¶¶ 8-14.

Despite the absence of any weapons or violence associated with Mr. Braxton, the Court pointed to the alleged seriousness of his criminal record to justify imposing a sentence toward the middle of the guidelines range—a range that already was enhanced by the "career offender" designation under U.S.S.G. § 4B1.1. But, at the time of the instant conviction, Mr. Braxton had seven criminal history points—the lowest number of points that correlated with a criminal history category IV.

In 1990, at the age of 21, Mr. Braxton was convicted of possession with intent to distribute at least five grams of cocaine base and carrying a pistol without a license. PSR at ¶ 28. In 1997, he was convicted of distribution of cocaine. PSR at ¶ 31. And in

2008, he was convicted of the attempted distribution of a ¼–gram of cocaine base worth $19. PSR at ¶ 35. Additionally, in 2006, Mr. Braxton was convicted of driving without a permit, an offense for which he received a suspended 60-day sentence. PSR at ¶ 33.

Without minimizing the harmful effect of drugs on a community, Mr. Braxton's conduct was not particularly aggravated. And compared to sentences typically imposed by this Court on defendants in comparable drug cases, Mr. Braxton's conduct certainly does not warrant a term of incarceration exceeding 24 years. He did not possess or use weapons, he did not engage in violence, and he did not deal in vast quantities of drugs. Yet he is serving a sentence that is longer than defendants convicted of trafficking in a large volume of drugs. For example, in *United States v. Plunkett*, No. ELH-11-0258, ECF No. 590 at 2 (D. Md. Sept. 23, 2020), this Court reduced a 180-month sentence to time-served (roughly 112 months) for a defendant who "conspired to distribute and possess with the intent to distribute at least 50 kilograms but less than 150 kilograms of cocaine." In *United States v. Blackwell*, No. JKB-10-0493, ECF No. 193 (D. Md. Feb. 19, 2020), the government recommended a sentence of 240 months for a defendant who for nearly seven years oversaw a "massive heroin distribution network in which [he] occupied a leadership role and from which he derived millions of dollars." And in *United States v. Fletcher*, No. TDC-05-0179, 2020 WL 2490025 (D. Md. May 14, 2020), this Court reduced the 264-month sentence to time-served (approximately 180 months) for a defendant convicted after trial of being the leader of a conspiracy involving 150 kilograms of cocaine and 1.5 kilograms of cocaine base.

16

2. A time-served sentence would both promote respect for the law and avoid unwarranted sentencing disparities between Mr. Braxton and his co-defendants

A time-served sentence also would promote respect for the law and avoid the unwarranted sentencing disparities that currently exist between Mr. Braxton and his more culpable or equally-culpable co-defendants, all of whom (like Mr. Braxton) pleaded guilty to one or more charged offense.

| Defendants | Counts of Conviction to Which Def. Pleaded Guilty | Sentence Imposed |
|---|---|---|
| Mack Holland | Ct. 1 (conspiracy / § 846) Ct. 2 (firearm / § 922(g)) Ct. 3 (firearm / § 924(c)) | 180 months |
| **Samuel Braxton** | Ct. 1 (conspiracy / § 846) | 324 months / reduced to **291 months** |
| Wayne Glymph | Ct. 1 (conspiracy / § 846) Ct. 2 (ammunition / § 922) | 120 months |
| Donald Hunter | Ct. 1 (conspiracy / § 846) Ct. 2 (firearm / § 922(g)) | 188 months |
| Rashard Wilson | Ct. 1 (conspiracy / § 846) | 235 months |
| Shareef Muhammad | Ct. 1 (conspiracy / § 846) | 144 months |
| Cortez Winston | Ct. 1 (conspiracy / § 846) | n/a |
| Kevin Brown | Ct. 1 (conspiracy / § 846) | 72 months / reduced to 60 months |
| Marcus Jones | Ct. 1 (conspiracy / § 846) | 71 months / reduced to 60 months |
| Beverly Barnes | Ct. 1 (conspiracy / § 846) | 24 months |
| Maurice Allen | Ct. 1 (conspiracy / § 846) | 12 months + day |

Mr. Holland, the conspiracy's leader, pleaded guilty to three offenses: the conspiracy charged in count one; possession of a firearm after a felony conviction, in violation of 18 U.S.C § 922(g); and possession of a firearm in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c). Mr. Holland admitted serving as the conspiracy's supplier. During a search of his residence, officers seized four firearms and nearly $60,000 in cash. He received a 180-month sentence, 120 months for the conspiracy and a consecutive 60-month term for the firearm conviction under § 924(c). *See* ECF No. 285 (Holland Plea Agr.); ECF No. 346 (Judgment).

Two other co-defendants, Wayne Glymph and Donald Hunter, both pleaded guilty to the drug conspiracy charged in count one, in addition to one count of possessing ammunition or a firearm after a felony conviction, in violation of 18 U.S.C. § 922. As part of Mr. Glymph's agreement, he forfeited eight loaded magazines of ammunition that had been seized from him and more than $26,000 in cash. The Court sentenced Mr. Glymph to 120 months for both counts. *See* ECF No. 230 (Glymph Plea Agr.); ECF No. 301 (Judgment). It sentenced Mr. Hunter to 188 months for both counts. *See* ECF No. 146 (Hunter Plea Agr.); ECF No. 334 (Hunter Judgment).

Two other co-defendants, Rashard Wilson and Shareef Muhammad, pleaded guilty only to the conspiracy charged in count one (like Mr. Braxton). The Court sentenced Mr. Wilson to 235 months' incarceration, and it sentenced Mr. Muhammad to 144 months' incarceration. *See* ECF No. 220 (Rashard Plea Agr.); ECF No. 292 (Rashard Judgment); ECF No. 320 (Muhammad Plea Agr.); ECF No. 355 (Muhammad Judgment).

Notably, for every one of the co-defendants described above, the government served a notice of enhanced penalties based on prior qualifying convictions under 21 U.S.C. § 851. And in each case, the defendant pleaded guilty in exchange for the government's agreement to withdraw the § 851 notice. In other words, *each* of the five

co-defendants (not only Mr. Braxton) had one or more prior conviction that qualified for a sentencing enhancement. The remaining co-defendants (for whom § 851 notices were not filed) also pleaded guilty. They received significantly shorter terms ranging from 12 months and one day to 72 months, which the Court subsequently reduced to 60 months under § 3582(c)(2). *See* ECF Nos. 243, 245, 255, 361.

3. <u>Mr. Braxton has demonstrated his successful rehabilitation and has expressed remorse for past mistakes</u>

Correctional officers have lauded Mr. Braxton's rehabilitative progress during the near decade he has spent in federal custody. Mr. Braxton has worked as a recreation orderly, receiving excellent performance reviews. And he has volunteered as a suicide watch companion, a demanding job for which he was chosen based on his trustworthiness, empathy, and patience. According to a recent progress report, Mr. Braxton:

- "participates and progresses in educational activities commensurate with his ability and occupation";

- "displays independent living skills . . . to include maintenance of a clean residence, a responsible budget to include a savings account, meal preparation, appropriate personal hygiene and appearance and proper etiquette";

- "acquires and maintains employment in order to become self-sufficient and fulfill financial obligations";

- "engages in purposeful activity, develops abilities useful in the acquisition and maintenance of post-release employment and pursuit of career goals"; and

- "engages in accurate self-appraisal by acknowledging and correcting irrational thinking patterns" and "obeys institutional rules and regulations;"

Exhibit G (BOP Progress Report) at 1-2. Mr. Braxton also "has maintained clear conduct during his incarceration." Over the course of 9 years, he has received only three citations for minor ("300-level") infractions, none of which resulted in the loss of good-time credit. In August 2013, he was cited for being "unsanitary or untidy." In 2016, he was cited for refusing to obey an order and being insolent to a staff member. And in October 2017, he was cited for falsifying a statement. Exhibit H (BOP Disciplinary Data).[5] In addition, Mr. Braxton has satisfactorily completed a drug education program, he has paid his court-ordered financial obligations, and he has participated in a release preparation program. Exhibit E at 2-3 (noting that Mr. Braxton "has secured his social security card and photo identification").

Another important factor that defines Mr. Braxton, though it may not be reflected in his BOP records, is the remorse he feels for his past failings. In a letter to this Court, Mr. Braxton writes that he was "arrogant and angry" when he last appeared before the Court. ECF No. 552-1 (Letter to Court). At the time, Mr. Braxton was upset with himself for falling back into drugs, a habit that ultimately destroyed his hope of creating a loving, stable home for his daughter, whose mother had recently died. In fact, at the time of the offense, Mr. Braxton had secured a job he enjoyed, counseling troubled youth. With that first step toward a new life, he looked forward to serving as a positive role model for his grieving daughter. ECF No. 461 (Sent. Trans.) at 41-42.

---

[5] Two infractions that Mr. Braxton incurred in 1994 and 2008 occurred during his previous incarceration and are unrelated to the sentence being served in this case.

Following sentencing, as Mr. Braxton stared down a 27-year term and felt overwhelming guilt for being absent from his daughter's life, he resolved to stay busy with work and programming and use the time productively so that he could return to his family a better man. Mr. Braxton has met that goal. Today, having served a term nearly twice as long as any previous sentence, Mr. Braxton now lives with the daily fear that he will contract COVID-19 in custody and will "die in jail" for his nonviolent crime. ECF No. 552-1.

His fear is certainly justified. Just one month ago, this Court granted compassionate release to a 49-year-old defendant who was housed at FCI Fort Dix, which at the time did not report any positive COVID-19 cases. The Court determined that the defendant's medical condition (though "hardly dire") could not be ignored because of the speed with which the disease was spreading through correctional facilities. *United States v. Stockton*, No. ELH-99-0352, ECF No. 657 (finding that defendant's conditions—"mild obesity," "mild intermittent asthma," allergic rhinitis, hyperlipidemia, and esophageal reflux—"pass muster" in context of pandemic). The Court explained:

> As of September 14, 2020, there were no reported infections among the inmates and no infections among the staff at FCI Fort Dix . . . . Nonetheless, as with the country as a whole, the virus persists in penal institutions. As of September 14, 2020, the BOP reported that it has 126,754 federal inmates and 36,000 staff. And, for that date, the BOP reported 1,930 inmates and 636 BOP staff currently tested positive for COVID-19; 11,476 inmates and 1,045 staff have recovered; and 119 inmates and two staff members died from the virus.

ECF No. 657 at 14 (internal citations omitted). In less than a month's time, the numbers look even worse. As of October 8, 2020, the number of BOP staff and inmates who have become infected with COVID-19 (including those who have recovered) rose from 15,087 to 17,202, and the number of BOP staff and inmates killed by the disease rose from 119 to 125. Of even greater relevance to Mr. Braxton, as of October 13, 2020, FCI Fort Dix reports that 9 inmates are currently fighting active COVID-19 infections, while 41 inmates and staff members have purportedly recovered from the disease. *https://www.bop.gov/coronavirus/*.

4. Incarcerating Mr. Braxton for an additional 12 years would not serve any legitimate sentencing goal under § 3553(a)

According to the Bureau of Prisons sentence computation data, assuming Mr. Braxton continues to retain all of his earned and projected good-time credit, he will not complete his sentence until October 23, 2032. Assuming that Mr. Braxton survives the COVID-19 pandemic, and assuming that he does not succumb to any other illness, he will be 64 years old at the time of his release. But incarcerating Mr. Braxton during this period of his life—between his early 50's and his mid-60's—does not satisfy *any* sentencing goal identified in 18 U.S.C. § 3553(a). It is not necessary to reflect the seriousness of his offense, to promote respect for the law, or to provide just punishment. It is not necessary to deter criminal conduct or to protect the public from additional crimes by Mr. Braxton. And it is not necessary to provide him with educational training or further correctional treatment.

Indeed, a cost-benefit analysis of Mr. Braxton's continued incarceration makes clear that it would not only fail to serve any legitimate purpose, but it would be

counter-productive. In a report, the Department of Justice assessed the BOP's ability to care for "aging" inmates (defined as those aged 50 and older) and concluded as follows:

(i)   it costs far more to incarcerate aging inmates primarily due to their increased medical needs;

(ii)  federal facilities lack appropriate staffing levels to address the needs of an aging inmate population;

(iii) the physical infrastructure of federal prisons cannot adequately house its current population of aging inmates;

(iv)  the Bureau of Prisons does not have programming opportunities that address the needs of aging inmates;

(v)   aging inmates commit less misconduct while incarcerated and have a lower rate of recidivism upon release;

(vi)  aging inmates are viable candidates for early release, though they are rarely given the opportunity due to BOP's strict internal policy for granting compassionate release.

U.S. Department of Justice, Office of the Inspector General, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons (May 2015); *see* U.S. Sent'g Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (2004), Ex. 9 (offenders over the age of 40 among those least likely to recidivate); Ex. 11 (drug offenders among those least likely to recidivate).

Mr. Braxton is an extremely obese 52-year-old man suffering from high blood pressure, asthma, and diabetes who is serving a sentence in excess of 24 years for drug activity in which he neither possessed a weapon nor engaged in violence. In light of his nonviolent past, as well as his current age and compromised health, Mr. Braxton poses a negligible risk of recidivism. Additionally, Mr. Braxton has completed treatment for his substance abuse problems, and he has worked diligently

over the past decade to abide by the myriad rules imposed on him. Mr. Braxton's successful rehabilitation is best demonstrated by the BOP's decision to house him in a low-security facility, where he has lived for approximately four years, even though more than a decade remains on his sentence.

*    *    *

Reducing Mr. Braxton's sentence would not diminish the seriousness of his offense, nor would it place the public in any danger. The extraordinary and compelling circumstances presented by the uncontrolled spread of COVID-19—which are compounded by Mr. Braxton's high-risk medical conditions (obesity, hypertension, diabetes, and asthma) and his inability to engage in basic self-protective measures while in BOP custody—warrants his compassionate release. As of October 2020, Mr. Braxton already has been incarcerated for 104 months, which is the rough equivalent of a 122-month sentence including good-time credit. Because a 122-month term is "sufficient, but not greater than necessary" to satisfy the goals of sentencing under § 3553(a), Mr. Braxton asks this Court to reduce his sentence to time served. Alternatively, if this Court is inclined to reduce the sentence to a term greater than 122 months, Mr. Braxton asks this Court to reduce his sentence to time served and to add a term of home confinement as a condition of his five-year term of supervised release.

## CONCLUSION

Samuel Braxton's unique vulnerability to suffering the worst effects of COVID-19 due to his extreme obesity, hypertension, diabetes, and asthma constitutes an extraordinary and compelling reason to grant him compassionate release. He urges

24

this Court to reduce the sentence imposed for his nonviolent drug offense from 291 months to time served. Alternatively, he urges this Court to issue an order reducing his sentence to time served and modifying his judgment to add a period of home confinement as a condition of supervised release.

Respectfully submitted,

JAMES WYDA
Federal Public Defender
for the District of Maryland

 */s/ Sapna Mirchandani*
SAPNA MIRCHANDANI
Assistant Federal Public Defender
6411 Ivy Lane, Suite 710
Greenbelt, MD 20770
Phone: (301) 344-0600
Fax: (301) 344-0019
*sapna_mirchandani@fd.org*

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing Supplemental Memorandum in Support of Motion for Compassionate Release was filed electronically with the Clerk of the Court using the CM/ECF system, which automatically sends notice of such filing to all registered counsel of record, including:

G. Michael Morgan, Jr.
Assistant U.S. Attorney
Office of the U.S. Attorney
6406 Ivy Lane, Suite 800
Greenbelt, MD  2070

on this 13th day of October, 2020.

_/s/ Sapna Mirchandani_
Sapna Mirchandani